**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

BLOOM PROTOCOL LLC,

                Plaintiff,

   -against-

GEOFFREY ARONE,

              Defendant.

Case No.:

**COMPLAINT AND**
**DEMAND FOR A JURY**
**TRIAL**

Plaintiff, Bloom Protocol LLC ("Bloom" or the "Company"), by its attorneys Sher Tremonte LLP, as and for its complaint against Defendant, Geoffrey Arone ("Defendant" or "Arone"), alleges as follows:

## NATURE OF ACTION

1.    This case arises out of Defendant Geoffrey Arone's unlawful use of Bloom's confidential information, misappropriation of Bloom's corporate property, illicit solicitation of Bloom's human resources, and malicious publication of false statements about Bloom, all in flagrant breach of Arone's contractual obligations to the Company.

2.    Defendant is the former interim Chief Executive Officer ("CEO") of Bloom Protocol LLC, a technology company headquartered in Longwood, Florida. He was initially hired by the Company as Chief Operating Officer in or around

April 2019 and transitioned to interim Chief Executive Officer of Bloom in or around May 2020.  In February 2021, Arone's employment with Bloom was terminated.

3.       While Arone was employed by the Company, Bloom furnished him with two company laptops and an iPad (the "Devices") to perform his work on behalf of Bloom and access Bloom's confidential information.  Defendant had – and, indeed, likely *still* has – access to a large amount of confidential information, including but not limited to the Company's business and marketing plans, details about Bloom's strategic relationships, bank accounts, pricing, employee performance and compensation, and draft patents.

4.       In his employment contract with Bloom (the "Employment Contract"), Arone agreed to be bound by robust confidentiality provisions that precluded him from disclosing Bloom's confidential information to anyone outside the Company or using such information for any competitive purpose.  He also agreed to be bound by the Company's written policies and procedures that further clarified those confidentiality obligations and set forth specific practices for ensuring the confidentiality of Bloom's sensitive information, including that all such information and all Company property was required to be returned at the termination of employment and that a remote access application was to be installed

on all Company laptops to ensure Bloom's ability to retrieve its confidential data remotely.

5.     The Employment Contract also contained non-disparagement and non-solicitation provisions that preclude Arone from directly or indirectly soliciting the resignation of any Bloom employee during Arone's employment and for twelve months thereafter, or making any statements that would tend to impugn the character, honesty, or business acumen of the Company or its affiliates.

6.     Eventually, it became clear that Arone was not adequately performing his job.  Most egregiously, he lied to the Company's Chief Financial Officer and to its General Counsel, falsely informing them that the Board of Managers that oversaw the Company (the "Board") had approved large financial transactions when it, in fact, had not.

7.     Upon information and belief, in the days and hours leading up to his termination, Arone orchestrated a scheme to misappropriate the Company's confidential data, solicit Bloom's Chief Technology Officer ("CTO") to resign from the Company, and turn Bloom's sole outside investor against the Company by feeding the investor and the CTO baseless and disparaging comments about Bloom and its founders.

8.     On the eve of his termination (and, upon information and belief, knowing that his termination was imminent), Arone sent an inflammatory email to

3

Bloom's founders and the Board (copying Bloom's CTO) falsely accusing the Company of failing to make certain disclosures to Bloom's sole outside investor. He also downloaded onto the hard drive of his Company computer all of the data from Bloom's Company-wide communication channels on Slack, a messaging platform used by Bloom to communicate and share files, including confidential and commercially sensitive communications and files. Shortly thereafter, upon information and belief, he deleted the record of the download.

9. In addition, Arone refused to return his Company Devices and refused to relinquish administrative control over, and suspend his access to, the Company's Slack account despite repeated written demands that he do so. Also, before the Company suspended his email access, Arone took the highly unusual step of deleting all emails from his email Sent box, except for an inflammatory email he sent the Board on the eve of his termination.

10. Arone met the Company's demands for return of Company property and data with complete silence.

11. Then, roughly five weeks after Arone's termination (and one day after the vesting of a previously scheduled bonus arranged by Arone), Bloom's CTO resigned, citing unspecified "recent events" and an inexplicable loss of "confidence in the [C]ompany's leadership and ethics."

4

12.     One day later, Bloom's sole outside investor made a demand for a complete return of his investment, citing as a basis for his demand the very same unsubstantiated allegations that Arone had falsely made in his internal email to the founders on the eve of termination.

13.     To date, Arone has failed to return the Company Devices and other Company materials and confidential information, in violation of the Employment Contract.

14.     Bloom brings this action to seek redress for Arone's breaches of the confidentiality, non-solicitation, and non-disparagement provisions of the Employment Agreement, to recover its confidential information and corporate property, to prevent further misappropriation of its commercially sensitive data, to halt the improper solicitation of its key human resources, and to preclude further malignment of its good name.

## THE PARTIES

15.     Plaintiff, Bloom Protocol LLC, is a Delaware limited liability company with its principal place of business in Florida.  It is wholly owned by Bloom Limited, a private limited company organized under the laws of Gibraltar.

16.     Defendant, Geoffrey Arone, is an individual residing in Seattle, Washington.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (a)(2) as the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     Defendant, Geoffrey Arone, is an individual domiciled in Seattle, Washington and is therefore a citizen of the State of Washington.

19.     The Company, including all members thereof, for jurisdictional purposes, is a citizen of the foreign state of Gibraltar.  Accordingly, Bloom and Defendant are diverse in citizenship.

20.     More specifically, the Plaintiff, Bloom Protocol LLC, is a Delaware limited liability company wholly owned by a foreign corporation, Bloom Limited, which is organized under the laws of Gibraltar.

21.     This Court has personal jurisdiction over Arone under Florida's long-arm statute, including Fla. Stat. §§ 48.193(a) and (g), because this action arises out of Arone's conduct in conducting business activities with Bloom, a company with its principal place of business in Florida, and more specifically, out of Arone's breach of his Employment Contract with Bloom, which contract is subject to and construed in accordance with the laws of the State of Florida.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because Bloom is headquartered at 374 Vista Oak Drive, Longwood,

6

Florida, which is located in the Middle District of Florida, and therefore a substantial part of the events giving rise to Bloom's claims occurred in this district.

## FACTUAL ALLEGATIONS

### *Creation of Bloom*

23.    Bloom is a technology company that uses the Ethereum blockchain to provide identity attestation, risk assessment, and credit scoring in both traditional and digital currency credit transactions.

24.    A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that relies on cryptographic techniques for secure recording of transactions.  Bloom operates an application that uses this technology to give consumers ownership over their identity and financial data by decentralizing the way that information is shared between untrusted parties.  The purpose of Bloom's product is to reduce the risk of identity theft and minimize costs associated with customer onboarding, compliance, and fraud prevention.

25.    The Company was founded in 2017 by Alain Pierre Meier, John Carlton Backus III, Jesse Jordan Leimgruber, and Ryan Douglas Faber (together, the "Founders" and individually each a "Founder").  The Company is wholly owned by Bloom Limited, which in turn is wholly owned by Bloom HoldCo LLC.

The Company is managed by the Board of Managers of Bloom HoldCo LLC (the "Board," as first defined above) and by the officers appointed by the Board.

26.     At all relevant times, the Board consisted of Bloom's Founders.

27.     From Bloom's founding, until approximately May 2020, Bloom was managed by its Founders.

### *The Company Hires Defendant and Defendant Agrees to be Bound by Confidentiality, Non-Disparagement, and Non-Solicitation Obligations*

28.     In or around April 2019, the Company hired Arone as its Chief Operating Officer.

29.     The offer of at-will employment was subject to the terms and conditions included in an Employment Contract with Bloom, which Arone signed on or about April 11, 2019.  A copy of the Employment Contract is attached as Exhibit 1 to this Complaint.

30.     As set forth in paragraph 9 of the Employment Contract, Arone's employment with Bloom was contingent upon his agreeing to be bound by specific "Covenants involving confidential information, confidentiality, intellectual property and work product, non-solicitation, and non-competition."  The Covenants were appended as Exhibit A to the Employment Contract (the "Covenants") and were enforced through the Company's written policies and procedures (including Bloom's Employee Handbook and Compliance Training

Agreement), which policies were also incorporated by reference in the Employment Contract.  Copies of Bloom's Employee Handbook and Compliance Training Agreement are attached, respectively, as Exhibits 2 and 3 to this Complaint.

31.     Although Arone's Employment Contract includes an arbitration clause, the agreement excepts from arbitration any action by Bloom to "enforce any confidentiality, non-disparagement, non-competition, or non-solicitation covenant" and expressly provides that the Company may "bring an action in any court of law or equity to specifically enforce" those obligations.  Ex. 1 ¶ 12.

32.     The Employment Contract also includes a choice of law and governing law provision providing that the contract is "subject to and construed in accordance with the laws of the State of Florida." Ex. 1 ¶ 14.

### Confidentiality Obligations

33.     Under the Covenants, Arone was not permitted to "divulge" Bloom Confidential Information "to any person." *Id.* ¶ A2.

34.     Confidential Information is defined broadly in the Employment Contract.  It includes "trade secrets ***and other information specific to the business and investment activities and considerations of the Company***." *Id.* ¶ A1 (emphasis added).  Such information "includes, but is not limited to, investment prospects, vendor lists, customer contact information, any pricing information,

strategic and marketing plans, compilations of customer and supplier information,

performance of and compensation paid to other employees, contracts with third

parties, information regarding the Company's training, financial and marketing

books, sales, price and marketing projections, internal employer databases,

analytical tools, products and services that facilitate the Company's ability to sell

and manufacture its services, or other reports, manuals and information including

information related to [the] Company, its affiliate companies, or its customers."

Ex. 1 ¶ A1.

36.    Arone's confidentiality obligations were further explained and

enforced by policies in the Employee Handbook and Compliance Training

Agreement, which were incorporated by reference in the Employment Contract.

36.    For example, to ensure compliance with the confidentiality

obligations contained in the Covenants, the Employee Handbook provided that

"[a]ny employee who improperly copies, removes (whether physically or

electronically), uses or discloses confidential information to anyone outside of the

Company may be subject to disciplinary action up to and including termination."

Ex. 2 at 5-21.  The handbook further required that, upon termination or resignation,

all employees return "all of the Company's Confidential Information" and "[a]ll

Company[] property including, but not limited to, keys, security cards, parking

passes, [and] laptop computers." *Id.*

37.     Similarly, the policies were clear that certain information could be used only for Bloom business. Bloom's Compliance Training Agreement, to which Arone also agreed to be bound in his Employment Contract, mandated that Bloom's "sensitive company information" could "only be used for express business purposes." Ex. 3 at 3.  Sensitive company information included financial information such as contract values, company performance, projects and compensation information, customer, partner, and vendor information, Bloom intellectual property, the identities of clients and business partners, business strategies, and any information concerning litigation, investigations, or other disputes involving Bloom.

38.     In addition, the Compliance Training Agreement obligated all employees to comply with Bloom's Remote Access Policy, which required employees to install a remote access application that permitted authorized persons at the Company to remotely access the employee's computer as necessary. *Id.* at 9.

### *Non-Solicitation and Non-Disparagement Obligations*

39.     The Covenants in the Employment Contract also included a non-solicitation provision, pursuant to which Arone agreed that "during [his] employment with the Company and for twelve (12) months after [his] employment terminates, [he] will not, directly or indirectly . . . (i) hire or solicit for hire or to provide services (whether as an employee, independent contractor, or otherwise)

any employee of the Company and/or its affiliates, [or] (ii) solicit, induce, or encourage the resignation of, or attempt to solicit, induce, or encourage the resignation of. . .any employee of the Company or its affiliates." Ex. 1 ¶ C3.

40.    The Employment Contract also provided that "[w]hile employed by the Company and for one (1) year thereafter, and except as may be required in the performance of [his] duties hereunder, [Arone] shall not, directly or indirectly, cause or induce, attempt to cause or induce, or otherwise solicit or encourage any person now or hereafter employed by the Company or any of its affiliates to terminate such employment." *Id.* ¶ C4.

41.    In addition, the Covenants included a non-disparagement provision, which required that Arone "not at any time make, publish, or communicate to any person or entity, any Disparaging . . . remarks, comments, or statements concerning the Company or its affiliates or their respective partners, members, or employees." *Id.* ¶ C7.

42.    "Disparaging" remarks are defined as "those that impugn the character, honesty, integrity, morality, business acumen or abilities of the individual or entity being disparaged." *Id.* ¶ C7.

### *Defendant Transitions to Interim Chief Executive Officer and Fails to Adequately Perform his Job Functions*

43.    In or around May 2020, Arone transitioned to interim CEO of the Company.

44.     In his capacity as interim CEO, Arone had access – via his Company Devices – to virtually all of the Company's confidential information, including information about the Company's investment prospects, vendor lists, customer contact details, marketing plans, strategic plans, bank accounts, human resources (including employee compensation), regulatory matters, draft patents, and product pricing.

45.     As interim CEO Arone also served as the administrator of several of the Company's Slack "channels," i.e., communications platforms in which employees, officers, and/or Board members engaged in group conversations.

46.     Following his appointment as interim CEO, Arone violated Company protocols with respect to obtaining authorization for large financial transactions. In or around December 2020, Arone directed Bloom's Chief Financial Officer ("CFO") to transfer approximately $1 million worth of the cryptocurrency Ethereum ("ETH") to a fund in Seattle as a purported investment on behalf of Bloom.  Arone falsely represented to the CFO and to the Company's General Counsel, that the transaction had been authorized by the Board.

47.     Contrary to his false representations, Arone had not even presented the proposed investment to the Board. Board member Jesse Leimgruber learned of the proposed investment just as Arone was directing the CFO to effectuate it.

48.     Leimgruber raised concerns that the transaction had not been properly reviewed and approved, and Bloom's CFO and General Counsel thereafter reminded Arone that he was not permitted to make such financial commitments on behalf of Bloom without Board approval.  Arone confirmed he understood that such transactions required Board approval.

49.     Shortly thereafter, Arone blocked Leimgruber's access to roughly a dozen different channels on the Company's Slack account without explanation (eventually, after another Board member intervened, Arone reluctantly restored access).

50.     Even after confirming he understood the need for Board approval of large transactions, Arone continued to attempt large transactions without Board approval.  For example, in or around January 2021, Arone directed the CFO to pay a large bonus to Bloom's CTO and to himself, falsely claiming to the CFO and the General Counsel that the bonuses had been approved by the Board.

51.     There were numerous issues with Arone's performance during his tenure as interim CEO.  Throughout 2020 and early 2021, many of these issues were brought to his attention.  The Board was planning to confront Arone again about his poor performance during a meeting on February 26, 2021.  However, as a result of Arone's attempts to gain leverage over the Founders, that meeting never took place.

***Arone Announces His Intent to Resign, Retracts his Resignation, and Then Fabricates Complaints Against the Company When He Realizes He Will be Terminated***

52.     In an apparent bid to elicit more concessions from the Founders, Arone threatened that he was on the verge of resigning.  On February 22, 2021, at 10:22 A.M., Arone texted Founder and Board member Alain Meier and said "it probably makes sense" for him to resign from Bloom.  He conveyed the same message to Founder and Board member Ryan Faber.

53.     Upon information and belief, Arone suggested an intent to resign because he wrongly anticipated that doing so would cause the Company's Founders to beg him to stay and possibly also to accede to demands for more authority and more money.

54.     That information and belief is based in part on other communications between Arone and Bloom's General Counsel that same day in which Arone (i) complained about one of the Founders having a right to vote on Board matters; (ii) complained that the General Counsel, who had been partially responsible for blocking the unauthorized transfers of funds, reported to the Board and not to Arone; (iii) pushed back on the notion that the Company needed to have basic controls in place relating to data system integrity and compensation plans; and (iv) groused at the need for Board approval of such matters, sarcastically remarking, "Remind me again why Bloom needs a CEO."

55.     Although the Founders expressed surprise, nobody asked Arone to stay.  Instead, they were prepared to discuss the details of his transition out of the Company.

56.     Arone conspicuously avoided such discussions.  When Board member Alain Meier asked to speak with Arone about his transition, Arone responded with a text stating that the situation was "fluid" and that he would get back to him later.

57.     Arone, upon information and belief, realized that his plan to gain leverage by threatening resignation had backfired, and that the Founders preferred to see him leave.  On information and belief, he realized that if he failed to follow through on his threatened resignation, the Company would terminate him.

58.     Arone thus changed tactics.  On the evening of February 23, 2021, in advance of a Google meeting planned between Arone and the Founders for the next day, Arone asserted baseless allegations completely out of left field.  The allegations concerned an outside investor in Bloom and the manner in which he had purchased shares – a transaction that had been completed a year and a half earlier.  Arone falsely – and without any apparent understanding of the 18-month-old deal – alleged that the Founders had failed to make certain disclosures to the outside investor, Collier Fund Limited ("Collier").

59.     Collier, through its principal Ricardo Villela Marino ("Marino"), had purchased 50 shares (5%) of Bloom HoldCo LLC in August 2019 (more than a

year and a half before Arone's false and disparaging February 23, 2021 email), in a private sale by the Company's Founders – with Leimgruber, Meier, Backus, and Faber each selling a portion of their shares directly to Collier.

60.     In his February 23 email, Arone falsely accused the Founders of failing to disclose to Marino certain regulatory and tax information affecting the Company and misrepresenting how the proceeds of Collier's purchase would be used.

61.     Arone copied on the email Bloom's CTO, Isaac Patka, and made clear that he had discussed these matters with Patka in advance of the February 23 email.

62.     The purported concerns expressed in the February 23 email were absurd. Arone was generally aware that the sale had been a private sale between the founders and Collier, which did not involve the Company. Moreover, the purchase agreement under which Collier purchased Bloom shares was accompanied by robust and explicit disclosures of the very topics Arone alleged were omitted.

63.     Upon information and belief, Arone made the false and disparaging statements in the February 23 email to undermine the Company and its Founders to Mr. Patka, who was copied on the email, and as a veiled threat that he would make these or other accusations publicly the Company followed through on terminating him.

17

64.     Upon information and belief, Arone had disparaged the Company and its Founders to Mr. Patka on other occasions.  That information and belief is based in part on Arone having inappropriately complained about Bloom's leadership and its management structure on communication channels viewable by Mr. Patka or other Bloom employees. That information and belief is also based in part on Arone having repeatedly made derogatory comments about one or more of its Founders during discussions with other Founders or with the General Counsel.

65.     After sending the February 23 email, Arone told the Board that their previously scheduled call to discuss his departure from Bloom would need to be postponed.

66.     The following day, February 24, 2021, Arone exported all of the data from one of Bloom's Slack channels that was used for Company-wide internal communications, including communications that could have included *years* of internal electronic messaging concerning Bloom's technology, customers, vendors, strategic planning, marketing, and third-party contracting.  Given the circumstances of his imminent departure from the Company, there was no legitimate business purpose for Arone to export such data.

67.     On February 24, 2021, at 4 P.M., Arone's employment was terminated.

68.     The termination letter reiterated Arone's contractual obligations, as set forth in the Employment Contract and the Employee Handbook and Compliance Training Agreement incorporated in that contract, prohibiting Arone from disclosing or accessing confidential information, disparaging the Company or its affiliates, or soliciting other employees to leave the Company.

69.     The termination letter also directed Arone to "immediately return any Company property currently in [his] possession, including both hard-copy and electronic data, as well as electronic and other equipment and items such as [his] laptop."

70.     Contrary to his contractual obligations, instead of returning the Company's data, Arone took steps to conceal the extent to which he had pocketed it.

71.     Upon information and belief, shortly after receiving the termination letter, Arone logged into Slack and deleted the record of his data export on February 23, 2021.  The deletion became apparent to Bloom because immediately following Arone's termination, the export logs on the Company's Slack channel reflected that Arone had downloaded a large amount of data just prior to his termination.  Within just a few hours later, however, that export was absent from the logs, indicating that someone had deleted the record of Arone's export in an attempt to avoid detection.

72.     Arone also took steps to destroy other Company information.  At some point before Bloom was able to complete the suspension of Arone's email access following his termination, Arone also deleted all of the emails in his sent box with one glaring exception: he retained a copy of the February 23 email in which he manufactured complaints against the Company.

### *Defendant Refuses to Relinquish Access to Bloom's Systems and Electronic Accounts*

73.     Following his termination, Arone continued to log into Bloom's Slack account on numerous occasions, in violation of the Employment Contract and the Employee Handbook incorporated in that contract.

74.     On or about February 25, 2021, Diana Bushard, Bloom's General Counsel, requested in writing that Arone stop using Bloom's Slack account and return his Company computers.  Ms. Bushard reiterated that Arone is "no longer authorized to access any of Bloom's systems or electronic accounts, including Slack."

75.     Despite these requests, Arone continued to log into Slack and failed to return his Devices and other Company materials.

76.     On or about March 4, 2021, Ms. Bushard sent Arone a second written request demanding that he stop using Slack and that he transfer his administrator privileges to Ms. Bushard.

77.     To date, Arone has not returned his Company Devices or Company Confidential Information in his possession, including any information regarding the progress or lack of progress that Arone made on various Company strategic initiatives that Arone was supposed to be leading for months, and including any Confidential Information he downloaded (whether appropriately or surreptitiously at the time) from the Company's systems.  Arone is thereby in breach of his obligations under the Employment Contract, including the rules of the Employee Handbook and the rules of the Compliance Training Agreement.  These rules forbid the use of the Company's Confidential Information for anything outside of legitimate business purposes and require the return of all Company property and information upon an employee's separation from Bloom.

78.     Arone's refusal to return the relevant Company property, including the Bloom-issued Devices and Slack data that Arone extracted, has caused and will continue to cause irreparable harm to Bloom.  Without limitation of the foregoing, other than the receipt of the Company Devices, Bloom has no way to protect and retrieve the confidential Company information stored on them.

79.     In violation of the terms of Bloom's Remote Access Policy, Arone had never installed the remote access application that would have allowed Bloom to remotely access the computers and retrieve confidential data if necessary.

***Communications from CTO and Investor Reflect that Defendant Disparaged the Company, Disclosed Confidential Information, and Solicited the Resignation of a Key Officer***

80.     Upon information and belief, Arone, in violation of the Employment Contract, disparaged the Company to its CTO Isaac Patka and solicited Mr. Patka to terminate his employment at the Company (in violation of the Employment Contract) by, among other things, falsely asserting to Mr. Patka that Bloom had failed to disclose certain tax and regulatory information to Mr. Marino, and otherwise misled Mr. Marino about the use of the proceeds of Collier's purchase of Bloom shares.

81.     That information and belief is based in part on the fact that immediately after Arone's February 23rd email, Mr. Patka told the Company's General Counsel that he was purportedly "disappointed to learn how the founders . . . concealed so much information" and "personally profited" from Collier's investment "at the expense of the company" and the fact that on April 1, 2021, Mr. Patka resigned from the Company, citing unspecified and unfounded concerns about Bloom's "leadership and ethics."

82.     Any concerns Mr. Patka had about the leadership or ethics of the Company was caused by disparaging comments by Arone.

83.     After giving notice of his resignation to Bloom, Mr. Patka used Company email to communicate about his resignation with lawyers at a law firm in

Seattle, Washington, where Arone has resided for many years.  Mr. Patka resides in New York and has no known connection to Seattle.

84.    Additionally, upon information and belief, Arone, in violation of the Employment Contract, disparaged the Company to Mr. Marino by falsely asserting to Mr. Marino that Bloom had failed to disclose certain tax and regulatory information to Mr. Marino, and otherwise misled Mr. Marino about the use of the proceeds of Collier's purchase of Bloom shares.

85.    That information and belief is based in part on the fact that, a few weeks after Arone's termination and one day after Mr. Patka's resignation, on April 2, 2021, Bloom's outside investor, Collier, submitted a demand for arbitration against the Founders, seeking a full return of its investments and citing as the basis for its demand a host of unsubstantiated allegations that track the purported concerns Arone manufactured in his February 23 email.

86.    Collier's demand for a return of its investment marked an abrupt shift in the relationship between Bloom and Collier. Indeed, just a few weeks before Arone's termination, Arone approached several Founders on behalf of Collier to attempt to purchase more shares of the Company.

## <u>CLAIMS FOR RELIEF</u>

## <u>FIRST CAUSE OF ACTION</u>
## BREACH OF CONTRACT
## (Breach of Confidentiality Obligations)

87.     Bloom repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

88.     This is a claim to enforce a restrictive covenant under Fla. Stat. § 542.335.  Through this claim, Blooms seeks injunctive relief, damages, and other applicable remedies for Arone's violation of the confidentiality provision of the Employment Contract.

89.     Arone had access to virtually all of Bloom's Confidential Information, including information about investment prospects, vendor lists, customer contacts, marketing and strategic plans, bank accounts, employee compensation, draft patents, and product pricing.

90.     The Confidential Information is owned solely by the Company and it is critical that the Company has access and control over the use and disclosure of its Confidential Information.

91.     To preserve these legitimate business interests, Bloom required Arone to accept the confidentiality provisions in the Employment Contract.

92.     The Employment Contract is a valid and binding agreement between Bloom and Arone, pursuant to which Bloom offered employment and

compensation to Arone and Arone agreed, among other things, to perform services for the Company and to refrain from misusing or disclosing Confidential Information.

93.     Bloom performed under the Employment Contract by, among other things, providing compensation and benefits to Arone.

94.     Arone materially breached the Employment Contract, including the Employee Handbook and Compliance Training Agreement incorporated by reference therein by, among other things: exporting Bloom Confidential Information from Bloom's Slack channel with no business purpose just prior to his departure from the Company, accessing Bloom's Slack account after his termination, failing to return his Company Devices (including, upon information and belief, the Confidential Information contained thereon) following his termination, and failing to install the remote access application that should have provided Bloom the ability to retrieve its Confidential Information remotely.

95.     Under Section 542.335, restrictive covenants are enforceable when the plaintiff: (i) establishes the existence of one or more legitimate business interests justifying the covenants, and (ii) shows that the covenants are "reasonably necessary" to protect the identified interests.

96.     Here, several legitimate business interests justify Arone's confidentiality obligations: (i) Bloom's interest in protecting its Confidential Information; and (ii) Bloom's interest in controlling its Confidential Information.

97.     The confidentiality provision is also "reasonably necessary" to protect Bloom's legitimate business interests because it protects only the business information and trade secrets specific to the Company itself, not information commonly known to the industry or information that is publicly available.

98.     By reason of Arone's contractual breaches, the Company has suffered, may suffer, and continues to suffer irreparable harm to its legitimate business interests, necessitating the enforcement of the covenant through injunctive relief, as well as damages in an amount to be determined at trial, but greater than $75,000.

99.     Under Section 542.335(1)(k), Bloom is entitled to recover from Arone the attorney's fees and costs that it incurs in connection with the enforcement of confidentiality provision.

100.   Bloom is entitled to all appropriate remedies, including without limitation compensatory damages and injunctive relief.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
### (Breach of Non-Disparagement Obligations)

101.   Bloom repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

102.   Bloom is a well-respected company in the decentralized blockchain-based identity attestation industry.

103.   Bloom has a strong interest in maintaining its good name and reputation among it customers, business partners, employees, and investors. To preserve these legitimate business interests, Bloom required Arone to accept the non-disparagement provision in the Employment Contract.

104.   The Employment Contract is a valid and binding agreement between Bloom and Arone, pursuant to which Bloom offered employment and compensation to Arone and Arone agreed, among other things, to perform services for the Company and to refrain from disparaging the Company.

105.   Bloom performed under the Employment Contract by, among other things, providing compensation and benefits to Arone.

106.   Arone materially breached the Employment Contract by, among other things, disparaging the Company by falsely stating to Mr. Patka and, upon information and belief, to Mr. Marino, that the Company had failed to disclose certain regulatory and tax information affecting the Company to Mr. Marino, that the Company had misrepresented to Mr. Marino the use of proceeds from Collier's purchase of shares, and that the Company was being improperly managed.

27

107.   Bloom's interest in protecting its good name and reputation justifies Arone's non-disparagement obligation.

108.   The non-disparagement provision is also "reasonably necessary" to protect Bloom's legitimate business interests because the non-disparagement provision prohibits Arone from making disparaging remarks only about the Company itself, its affiliates, or their respective partners, members, or employees.

109.   By reason of Arone's contractual breaches, the Company has suffered, may suffer, and continues to suffer irreparable harm to its legitimate business interests, necessitating the enforcement of the covenants through injunctive relief, as well as damages in an amount to be determined at trial, but greater than $75,000.

110.   Under Section 542.335(1)(k), Bloom is entitled to recover from Arone the attorney's fees and costs that it incurs in connection with the enforcement of non-disparagement provision.

111.   Bloom is entitled to all appropriate remedies, including without limitation compensatory damages and injunctive relief.

### THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
### (Breach of Non-Solicitation Obligations)

112.   Bloom repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

113.   Bloom is a forerunner in the specialized field of decentralized blockchain-based identity attestation and the Company has developed some of the most valuable technology in the field.

114.   Bloom's employees have extensive and unique knowledge about this field and are among the most talented engineers in the industry.

115.   Bloom's success in the decentralized blockchain-based identity attestation space depends on Bloom's retention of the talent it has recruited.

116.   To preserve these legitimate business interests, Bloom required Arone to accept the non-solicitation provision in the Employment Contract.

117.   The Employment Contract is a valid and binding agreement between Bloom and Arone, pursuant to which Bloom offered employment and compensation to Arone and Arone agreed, among other things, to perform services for the Company and to refrain from soliciting any of the Company's employees as more particularly described above.

118.   Upon information and belief, Arone materially breached the Employment Contract by, among other things, soliciting Bloom's former CTO, Mr. Patka, to resign his employment from the Company by making false statements about the Company, including false statements that the Company had failed to disclose material information to an investor, and by encouraging Mr. Patka to pursue other professional opportunities outside of Bloom.

119.   Several legitimate business interests justify Arone's non-solicitation obligations: (i) the protection of Bloom's interest in maintaining a competent workforce; and (ii) the protection of Bloom's interest in its business reputation.

120.   The non-solicitation provision is also "reasonably necessary" to protect Bloom's legitimate business interests, and are reasonable in time, area, and line of business, as it is limited to a one-year duration for former employees and only applies to employees of the Company and its affiliates.

121.   By reason of Arone's contractual breaches, the Company has suffered, may suffer, and continues to suffer irreparable harm to its legitimate business interests, necessitating the enforcement of the non-solicitation provision through injunctive relief, as well as damages in an amount to be determined at trial, but greater than $75,000.

122.   Under Section 542.335(1)(k), Bloom is entitled to recover from Arone the attorney's fees and costs that it incurs in connection with the enforcement of the restrictive covenants.

123.   Bloom is entitled to all appropriate remedies, including without limitation compensatory damages and injunctive relief.

## **DEMAND FOR RELIEF**

WHEREFORE, the Company prays for judgment against Defendant as follows:

1.      A preliminary and permanent injunction: (1) compelling Defendant to return all Bloom property and Confidential Information (as defined in the Employment Contract) in his possession, custody, or control, including Company laptops and Confidential Information stored on the laptops;  (2) enjoining Defendant from deleting Company-related information from any accounts or devices within his control; (3) enjoining Defendant from acquiring, including by downloading from Company-owned accounts, any Company information without the Company's consent and from disclosing Bloom Confidential Information to any third party; (4) enjoining Defendant from interfering with or failing to cooperate with the Company's ability to control its confidential and sensitive business information; (5) enjoining Defendant from soliciting any Bloom employees to resign from Bloom or to accept employment outside of Bloom; and (6) enjoining Defendant from making any statements to any private party that disparage Bloom, including but not limited to statements to existing or potential investors, customers, vendors, or competitors that impugn the character, honesty, integrity, morality, business acumen, or abilities of Bloom or its principals; (7) enjoining Defendant from soliciting, inducing, or encouraging the resignation of any employee of Bloom or its affiliates, or from attempting the same; and (8) enjoining Defendant from disclosing any Company information protected by the attorney-client privilege.

2.      An award of damages in an amount to be determined at trial, but greater than $75,000, plus interests and costs;

3.      An award of punitive damages in an amount to be determined at trial;

4.      An award of costs and disbursements of this action, including attorneys' fees to the fullest extent recoverable under applicable law, including without limitation pursuant to Fla. Stat. § 542.335(1)(k); and

5.      For such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Bloom demands a jury trial on all claims and issues so triable.


Dated:     New York, New York     Respectfully submitted,
            April 28, 2021

MARCUS NEIMAN RASHBAUM &
PINEIRO LLP

By: *  /s/ Jeffrey Marcus   *
        Jeffrey Marcus
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131
Tel: 305.400.4260
Email: jmarcus@mnrlawfirm.com

*Attorneys for Plaintiff*

Of Counsel:

SHER TREMONTE LLP
  Kimo Peluso
  Erica A. Wolff
  Robert C. Penn Jr.
  Elizabeth Janszky
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Email: kpeluso@shertremonte.com

(*pro hac vice applications forthcoming*)